UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **RONALD HOF, in his Capacity as Chapter 7 Trustee of FoodServiceWarehouse.com, L.L.C**. | **16-11179** SECTION A |
| DEBTOR(S) | CHAPTER 7 |
| **RONALD HOF, in his Capacity as Chapter 7 Trustee of FoodServiceWarehouse.com, L.L.C**. | ADVERSARY NO. **18-1002** |
| PLAINTIFF | |
| VERSUS | |
| **PRIDE CENTRIC RESOURCES, INC. (fka Pride Marketing and Procurement, Inc.)** | |
| DEFENDANT | |

**<u>MEMORANDUM OPINION</u>**

This matter came before the Court on the Motion for Preliminary Injunction filed by Ronald Hof in his capacity as Chapter 7 Trustee for FoodServiceWarehouse.com, L.L.C. ("FSW").

**I. Facts**

Pride Centric Resources, Inc., f.k.a. Pride Marketing and Procurement, Inc., ("Pride") is a food service equipment collective. Members of Pride formed FSW in 2006 to sell equipment online. Many of FSW's members and managers are also members and/or managers of Pride.

During the relevant period, Pride's Board members were Kevin Bouma, Mike Bell, Jay Pattinger, Demetre Selevredes, Gary Thiakos, Ian McIntyre, Steve Dickler, David Castino, Ellison Berlin, David Curran, and Tom Carr. Exh. 42. Pride's Chief Financial Officer ("CFO") was Louis Puissegur, and Pride's Chief Executive Officer ("CEO") was Robert Autenreith.

On October 15, 2012, FSW opened a line of credit with IberiaBank ("Iberia") in the amount of $3,000,000.

On October 15, 2013, Pride agreed to guarantee $2,000,000 on an increase of $5,000,000 in FSW's line of credit.

On May 27, 2014, Iberia increased FSW's line of credit to $10,000,000, and Pride increased its guaranty to $5,000,000.

On June 19, 2014, FSW hired LaPorte APLC to conduct an audit of its books and records as of December 31, 2013. Exh. 5.

On June 19, 2014, Pride hired LaPorte APLC to conduct an audit of its books and records as of December 31, 2013.  Exh. 35.

On September 12, 2014, LaPorte APLC completed its audit report of FSW for 2012 and 2013 ("FSW Audit 1").    Exh. 7.

On September 12, 2014, LaPorte APLC completed its audit report of Pride for 2012 and 2013 ("Pride Audit 1").    Exh. 8.

On October 14, 2014, Iberia increased FSW's line of credit to $20,000,000, and Pride increased its guaranty to $10,000,000.

On April 24, 2015, Iberia increased FSW's line of credit to $21,000,000.

On June 19, 2015, FSW contracted with LaPorte APLC to audit its books and records as of December 31, 2014.  Exh. 14.

On June 19, 2015, Pride contracted with LaPorte APLC to audit its books and records as of December 31, 2014. Exh. 15.

On June 29, 2015, FSW approached JP Morgan Chase Bank ("Chase") for a loan in the amount of $75,000,000.00.

On July 9, 2015, Chase began an audit of FSW.

On August 31, 2015, FSW hired Brad Stone as CFO.

On September 14, 2015, LaPorte APLC completed its audit of Pride for 2013 and 2014 ("Pride Audit 2"). Exh. 18.

On October 13, 2015, LaPorte APLC's completed its audit of FSW for 2014 ("FSW Audit 2"). Exh. 19.

On December 3, 2015, Robert Autenreith sent an email to Kevin Bouma, Tom Carr, David Curran, Steve Dickler, Gary Licht, Ian McIntyre, Mike Bell, and Madhu Natarajan, Brad Stone, and Louis Puissegur stating that FSW had "cash flow and net income problems which are being solved." Exh. 21. One of the solutions being explored was a loan from JP Morgan Chase.

On December 21, 2015, Robert Autenreith emailed David Castino, David Curran, Demetre Selevredes, Ellison Berlin, Gary Thiakos, Ian McIntyre, Jay Pattinger, Kevin Bouma, Mike Bell, Mini,[1] Rudy Ourso, Ryan Carr, Sherri Lilly, and Steve Dickler advising of Iberia's request for an increase in the Pride guaranty from $10,000,000 to $15,000,000. Exh. 22.

On December 22, 2015, Robert Autenreith notified Iberia Bank that Pride's Board had voted in favor of increasing its guaranty of FSW's debt Iberia to $15,000,000. Exh. 23.

In January 2016, Chase informed FSW that it could not proceed with FSW's requested loan.

On or about March 10, 2016, Iberia swept approximately $8,590,000 from Pride's bank account.

-------

[1] The last name of "Mini" is not in the email.

3

After March 10, 2016, Pride entered into an agreement with Iberia to satisfy its guaranty obligation by paying $7,500,000 in addition to the amount that Iberia swept from Pride's bank account.  Exh. 48.

On March 18, 2016, FSW hired Thomas Kim as its Chief Executive and Restructuring Officer.

On May 20, 2016, Debtor filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code.  The case was converted to Chapter 7 on October 12, 2016, and Ronald Hof was appointed Chapter 7 trustee ("Trustee").

On September 19, 2016, Pride filed Proofs of Claim 209-1 and 209-2 in the unsecured amount of $32,624.563.93.  On January 19, 2017, Pride amended its claim by filing Claim 209-3 in the same amount.

On October 12, 2016, Pride filed an Application for Accountant Review Panel against LaPorte APLC and Cheryl Haspel, Tracy Tufts, Anthony M. Rutledge, Michael Simon, and Terri Troyer, employees of Laporte (collectively "LaPorte").   On August 16, 2017, Pride filed a First Supplemental and Restated Application for Accountant Review Panel.  On November 27, 2017, Pride filed a Second Supplemental, Amending and Restated Application for Accountant Review Panel ("Pride Complaint").  Exh. 48.

Pride alleges it incurred the following direct damages between September 15, 2015, and June 30, 2016, in reliance on FSW Audits 1 and 2 (collectively "FSW Audits") as well as the Pride Audits 1 and 2 (collectively the "Pride Audits").  The damages requested can be described as:

1. Advances of $1,204,054.79 to FSW for rebates to FSW customers earned but not yet paid by FSW vendors to FSW ("Rebate Costs");

2. Advances of $5,715,061.20 in additional guarantees to Iberia;

4

3. Loans of $3,762,677.53 to FSW ("Loans");

4. Payroll advances of $50,811.50 to FSW ("Payroll Costs");

5. $100,130.81 in advances to Primoris, LLC d/b/a Saturn ("Saturn");

6. Advances, expenses incurred or resources expended for FSW's licensing program of $84,995.79 ("Licensing Costs");

7. Advances, expenses incurred or resources expended for FSW's Market Source Operating Division of $1,258.42 ("Marketing Costs");

8. Advances, expenses incurred or resources expended for FSW's operations ("Operating Costs") totaling $398,276.53; and

9. Payments of $7,003,733.78 to vendors of FSW on invoices guaranteed by Pride ("Vendor Guarantees").

P-35.

On October 31, 2016, Trustee filed an Application to Employ Special Counsel for FSW's claims against LaPorte. Case 16-11179, P-320. The Application was approved by the Court on November 14, 2016. Case 6-11179, P-337.

**II. Procedural History**

On January 15, 2018, Trustee initiated the above-captioned adversary by filing a Complaint against Pride for declaratory and injunctive relief ("Trustee Complaint"). P-1. The Trustee Complaint seeks declaratory judgment on the applicability of 11 U.S.C. § 362(a)(3) to the Pride Complaint. In the alternative, the Trustee Complaint seeks injunctive relief against further action on the Pride Complaint through 11 U.S.C. § 105(a).

5

Trustee filed an Emergency Motion to Enforce the Automatic Stay and/or for a Temporary Restraining Order, which was heard by the Court on January 22, 2018. The Court denied the Motion for Temporary Restraining Order and scheduled hearings on the Motion to Enforce the Automatic Stay and for Preliminary Injunction on February 7, 2018. P-13. The Court afforded the parties time to file additional briefs: Trustee's brief was due on January 31, 2018, and Pride's brief was due on February 2, 2018.

On January 30, 2018, Trustee filed a Motions for Stipulated Protective Order and to File Its Brief Under Seal. P-16, 17. The Court approved those Motions on February 1, 2018. P-18 and 19.

On February 7, 2018, hearing on the request for preliminary injunctive relief occurred. P-29. The Court afforded the parties time to file additional briefs and continued the hearing to April 11, 2018. Pride's brief was filed under seal on March 1, 2018, and Trustee's was filed on March 26, 2018. P-35 and 46.

At the hearing on April 11, 2018, the parties asked for a continuance to negotiate settlement. The Court continued the matter to June 13, 2018. P-57. The parties did not reach an agreement.

On May 17, 2018, Trustee submitted a letter of complaint against LaPorte to the Society of Louisiana Certified Public Accountants. Exh. 47.

Trustee seeks preliminary injunctive relief under Bankruptcy Rule 7065 against Pride's prosecution of any claims against LaPorte arising from or related to the failure of FSW or any of the obligations owed by FSW to Pride. Trustee contends all damages incurred by Pride are derivative from causes of action FSW holds against LaPorte; as such, they are property of the bankruptcy estate. Alternatively, if any of the claims contained in the Pride Complaint are not derivative of FSW, Trustee seeks an injunction against Pride through the exercise of 11 U.S.C. § 105.

6

Pride argues its injuries result from its personal reliance on the FSW and Pride Audits. As such, it avers that the causes of action are direct and independent of the claims held by FSW and are not property of the estate. It also argues against the imposition of an injunction from the pursuit of those claims on the same basis.

## III. Law and Analysis

Pride alleges that it relied upon the FSW Audits in making corporate investments, guarantees, or loans. It asserts that the FSW Audits did not fairly reflect the financial condition of FSW when these decisions were made because of material misstatements in the financial statements; FSW's noncompliance with laws and regulations; and significant deficiencies or material weaknesses in FSW's internal controls. As a result, Pride allegedly suffered particular losses separate and apart from its investment in FSW or the obligations owed to it prior to the issuance of the FSW Audits. Specifically, Pride avers that LaPorte failed to:

1. Discover FSW losses of $10-15 million in 2015, rather than the profit previously recorded and accepted by FSW Audit 2;

2. FSW Audit 2 failed to disclose an existing default on the loans between FSW and Iberia. That default is alleged to have occurred in June of 2015;

3. LaPorte failed to discover an overstated inventory valuation allowance causing an inflated calculation in income for 2013-2014; and

4. Numerous deficiencies in FSW's accounting systems, internal controls, and other matters that were significant to the oversight of the financial reporting process.

Pride has alleged damages as a result of these deficiencies. Its damages fall into five (5) broad categories:

1. Rebate Costs;

2. $5,715,061.20 in payments to Iberia on guarantees executed after the FSW Audits;

7

    3. Loans, Licensing, Marketing, Operation and Payroll Costs;

    4. $100,130.81 in advances to Saturn; and

    5. Vendor Guarantees

P-35.

    The Pride Complaint also alleges inaccuracies in the  Pride Audits:

    1.  LaPorte incorrectly concluded that FSW's members and not Pride were the primary beneficiaries of financial support provided by Pride to FSW.  Therefore, it did not recommend  consolidation of FSW and Pride's financial returns under a variable interest entity theory;

    2.  LaPorte failed to discover and identify unauthorized advances made by Pride to customers of FSW for manufacturer rebates earned but not yet paid;

    3.  LaPorte failed to discover and identify unauthorized guarantees issued by Pride to FSW manufacturers/vendors for products ordered; and

    4.  LaPorte failed to disclose FSW's default on the Iberia Bank loan guaranteed by Pride.

As a consequence of these alleged actions, Pride argues that the following damages were incurred:

    1.  The issuance of additional guarantees to Iberia Bank for $5,000,000.00 resulting in payments of $5,715,061 on FSW's default;

    2. $7,003,733.78 in payments on FSW vendor manufacturer guarantees issued by Pride's CFO or CEO and which exceeded their authority;

    3. The loss of $1,204,054.79 in advances to FSW customers for earned but unpaid vendor manufacturer rebates owed FSW.  Pride alleges that these advances exceeded the authority of Pride's CEO and CFO; and

    4.  $100,130.81 in advances to Saturn.

    As a threshold matter, Trustee challenges Pride's assertion that it holds any causes of action against LaPorte.  Trustee argues Pride has failed to state a claim upon which relief may be granted.

8

## A.  Pride States a Cause of Action Against LaPorte

The Pride Complaint alleges two overarching causes of action: one against Laporte for damages resulting from its reliance on the FSW Audits and the other for breach of contract and negligence in connection with the Pride Audits.  To state a cause of action, Pride must allege "enough facts to state a claim that relief is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1973 (2007).

### 1.  The Pride Audits

Pride contracted with LaPorte for its audit services. All of LaPorte's engagement letters with FSW and Pride contained the same language.  Under those agreements, LaPorte  obligated itself to audit the financial statements of Pride including balance sheets, statements of operations, changes in members' equity, cash flows, related notes to financial statements, and any supplemental information.  Exh. 8, 18, 34, 35.  LaPorte's objective was to "express[] an opinion on the financial statements." Exh. 35, p. 1.[2]  The engagement letters require that LaPorte "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement."*Id*.

The engagement letters between Pride and LaPorte provide:

In making our risk assessments, we consider internal control relevant to the Company's preparation, and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. However, we will communicate to you in writing concerning any significant deficiencies or material weaknesses in internal control relevant to the audit of the financial statements that we have identified during the audit.

---

[2] Exh. 35 includes engagement letters dated June 19, 2014, and June 19, 2015, that contain identical language.

9

We will also communicate to the board of directors (a) any fraud involving senior management and fraud (whether caused by senior management or other employees) that causes material misstatement of the financial statements that becomes known to us during the audit, and (b) any instances of noncompliance with laws and regulations that we become aware of during the audit (unless they are clearly inconsequential).

La. R.S. 37:91(B)(1) states:

B. No action based on negligence may be brought against any defendant licensee, or any employee or principal of a defendant licensee, unless the plaintiff claims to have been injured as a result of their justifiable reliance upon financial statements or other information examined, compiled, reviewed, certified, audited, prepared pursuant to a preparation of financial statement engagement, or otherwise prepared, reported or opined on by the defendant licensee or in the course of the defendant licensee's engagement to provide other services and at least one of the following conditions apply:

(1) The plaintiff is the issuer or successor of the issuer of the financial statements or other information examined, compiled, reviewed, certified, audited, prepared pursuant to a preparation of financial statement engagement, or otherwise prepared reported, or opined on by the defendant licensee, and such plaintiff has engaged the defendant licensee to examine, compile, review, certify, audit, prepare pursuant to a preparation of financial statements or to provide other services. ...

Pride identifies several facts which if true might constitute professional negligence in the preparation of the Pride Audits. Specifically, Pride alleges that it retained LaPorte to investigate and document not only its financial status, but also review its internal controls over operations and financial affairs. In connection with this retention, Pride asserts that LaPorte failed to discover actions by its officers which exceeded their authority and increased Pride's losses. Specifically, Pride points to guarantees granted to FSW vendors in order to secure purchases on credit. Pride asserts it lost over $7,000,000.00 after FSW failed to pay these accounts.

Pride also alleges that its officers exceeded their authority by advancing FSW funds to pay customers for earned but unpaid rebates owed by FSW vendors.  Pride's losses in connection with these activities are alleged to exceed $1,200,000.00.

Pride claims that LaPorte's advice concerning its ability to consolidate financial returns with FSW cost it an additional, undisclosed amount.

Finally, Pride asserts approximately $100,000 in amounts due to it by Saturn, a subsidiary of FSW but an independent and unrelated claim to those asserted against FSW.

The allegations asserted by Pride with regard to LaPorte's alleged failure to discover the transgressions of its officers fall directly within the confines of its contract with LaPorte.  In total, Pride asserts that the *ultra vires* actions of its officers resulted in unrecorded direct or contingent debt exceeding $8,000,000.  In addition, LaPorte's failure to report FSW's default on the Iberia loan resulted in a material misstatement on the status of Pride's contingent debt to Iberia. LaPorte's alleged malpractice in connection with its advice regarding the ability of Pride to file consolidated financial returns also potentially falls within LaPorte's duties under its contract with Pride. Any failure to professionally discharge that commitment could result in liability for LaPorte.  As a result, Pride has stated a cause of action against LaPorte for breach of contract or professional negligence.

## 2. The FSW Audits

Pride has alleged that a large share of its advances to FSW were made because it relied on LaPorte's opinion in the FSW Audits.  Trustee argues that Pride has no cause of action against LaPorte in connection with the FSW Audits.  La.R.S. 37:91(B)(2)  provides:

B. No action based on negligence may be brought against any defendant licensee, or any employee or principal of a defendant licensee, unless the plaintiff claims to have

11

been injured as a result of their justifiable reliance upon financial statements or other information examined, compiled, reviewed, certified, audited, prepared pursuant to a preparation of financial statement engagement, or otherwise prepared, reported or opined on by the defendant licensee or in the course of the defendant licensee's engagement to provide other services and at least one of the following conditions apply:

*                               *                               *

(2) The defendant licensee was aware at the time the engagement was undertaken that the financial statements or other information were to be made available for use in connection with a specified transaction by the plaintiff who was specifically identified to the defendant licensee, was aware that the plaintiff intended to rely upon such financial statements or other information in connection with the specified transaction, and had direct contact and communication with the plaintiff and reliance on such financial statements or other information.

Clearly, Louisiana law provides a cause of action for parties in Pride's position. Specifically, Pride avers that LaPorte knew that the FSW Audits would be used to request an increase in FSW's Iberia line of credit. Pride alleges that LaPorte was aware that any increase in the line would require a commitment from Pride to increase its guaranty. As a result, Pride asserts that LaPorte knew it was relying on the FSW Audits concerning the decision to increase its contingent debt.

Pride more generally alleges that advances to FSW for Rebate, Operating, Payroll, Licensing, or Marketing Costs; Loans; and Vendor Guarantees were dependent on LaPorte's findings. As such, Pride has stated a cause of action under La. R.S. 37:91(B)(2).

Having established that Pride has stated causes of action against LaPorte for damages sustained in connection with the Pride and FSW Audits, the next issue to consider is whether or not any of the claims are derivative of FSW or directly held by Pride.

### B.  Does the Pride Complaint Assert Claims Belonging To the  Estate?

Property of the estate includes "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).   The Fifth Circuit defines "all legal and equitable interests" "broadly to includes causes of action." *Matter of Educators Group Health Trust*, 25 F.3d 1281, 1283 (5th Cir. 1994).   A trustee has exclusive standing to assert causes of action that are property of the estate.   *Id.* at 1284 (citing *Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142, 1153-54 (5th Cir. 1987))*; see also Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities, L.L.C.*, 429 B.R. 423, 430 (Bankr.S.D.N.Y. 2010) ("*Madoff* 2010").   However, if  "a cause of action belongs solely to the estate's creditors, then the trustee has no standing" to assert it. *Matter of Educators Group Health Trust*, 25 F.3d at 1284.

> Whether a particular [ ] cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case.

*Id.*   In determining whether a cause of action is property of the estate, the Court must examine the "nature of the injury for which relief is sought." *Id*.

> If a cause of action alleges only indirect harm to the creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.

*Id.*  A trustee has exclusive standing to raise a causes of action that "generally affect[s] all creditors" and could be brought by any creditor. *Madoff* 2010*,* 429 B.R. at 431.

### 1.  Derivative Versus Independent Causes of Action

If a cause of action is based on the defendant's conduct with regard to the debtor, it typically will belong to the estate.  The simplest example is a suit by the debtor against a defendant for fraud

or breach of contract.  In either case, the defendant's conduct is alleged to have caused damage to the debtor.

Estate claims may also extend to causes of action held by creditors under state law.  For example, fraudulent conveyance or revocatory actions are held by creditors and prosecuted by them in state courts to recover property a debtor transferred to a third party. *See* La. C.C. Art. 2036. Generally, under state law, any recovery is kept by the creditor. *See Dorries v. Linder*, 51, 070 (La.App. 2 Cir. 1/11/17), 211 So.3d 1242.

Bankruptcy seeks to ensure the orderly liquidation of assets and a fair distribution to creditors based on the Code's priorities.  In state law fraudulent conveyance actions, the recovery of assets wrongly transferred by a debtor to a third party for the sole benefit of a creditor offends these principles.  State law avoidance claims pursue damages for injuries to the debtor, not directly to the creditor.  Because the creditor's damage is only as a result of the damage inflicted on the debtor, the creditor is actually asserting a claim for derivative damage. As a result, the Fifth Circuit has held that avoidance actions are property of the estate as are their recoveries. *See American National Bank of Austin v. Mortgage America Corp. (In re Mortgage America Corp.)*, 714 F.2d 1266 (5th Cir. 1983).

An example of this policy can be found in the case of *American National Bank of Austin v. Mortgage America Corp.*  In *Mortgage America,* an officer of Mortgage America Corp. ("M.A.") transferred, for his own benefit, M.A.'s assets.  One of M.A's creditors filed suit against the officer in state court alleging that the transfers were fraudulent conveyances.  M.A. filed for bankruptcy relief and requested a stay of the state court proceeding, alleging that the cause of action was

property of the estate.  The Fifth Circuit found that the cause of action belonged to the estate, section 362 applied, and reasoned:

> Actions for recovery of the debtor's property by individual creditors under state fraudulent conveyance laws would interfere with this estate and with the equitable distribution scheme dependent upon it, and are therefore appropriately stayed under section 362(a)(3).

*Id.* at 1276.

Because the creditor's claim against the officer to recover the debtor's assets was based on conduct between the debtor and officer (rather than the creditor and officer) and the creditor had not suffered any particularized injury as a result of the conduct, the Fifth Circuit found that the recovery should be shared by all creditors, not just those who win the race to the courthouse.

On the other hand, if a creditor alleges *particular* injury "'significantly different' from the injuries to creditors in general," the creditor has standing to pursue the claim; the claim is not property of the estate; and the automatic stay is not applicable.  *Madoff* 2010, 429 B.R. at 431.

Therefore, as an initial matter the Court must determine which, if any, claims asserted by Pride are derivative of FSW and therefore, property of the estate.  This determination will then advise as to the proper legal basis for considering the relief requested.

## 2. Jurisprudence

In *Phar-Mor, Inc.v. General Electric Capital (In re Phar-Mor, Inc., et al)*, 166 B.R. 57 (W.D.Penn. 1994), Phar-Mor sued its accountant, Coopers & Lybrand, C.A. ("Coopers") for negligence and breach of contract for failing to uncover fraud in its audits.  Some of Phar-Mor's creditors filed independent actions against Coopers alleging that they relied on Coopers' audits of Phar-Mor in extending credit.  Phar-Mor sought to enjoin the creditors under 11 U.S.C. § 105(a) from pursuing claims against Coopers.

15

The Court found that the claims of reliance on Coopers' audits were personal to the creditors, and "the fact that [Phar-Mor was] also injured by the audits [did] not transform the [c]reditor [a]ctions into derivative claims." *Id.* at 62.

> The Creditor Actions are based on the premise that Coopers breached a duty of care to each of the Creditor[s]. They do not rely on Coopers' alleged breach of contractual obligations or duties to Phar-Mor.

*Id.* The Court also found that the creditors' actions would not compromise Phar-Mor's "ability to assert its own claims against Coopers." *Id.*

> Moreover, the fact that the Creditor Actions may result in disproportionate recoveries by certain creditors is also irrelevant. The Code is concerned with a disproportionate *distribution* of the debtor's estate.

*Id.* (emphasis in original).

Phar-Mor argued that the creditors' suits diminished the possibility of it settling its own claim with Coopers. The Court found that this was "mere speculation" that did "not constitute the type of proof required to entitle [Phar-Mor] to an injunction" and did "not rise to the level of irreparable harm." *Id.* at 63. The Court found that Coopers was solvent, and there was no basis to conclude that it would not be able to satisfy all judgments. The Court also found that the harm to the creditors should an injunction be issued outweighed any harm to Phar-Mor.

> [A] stay of the Creditor Actions would act to subrogate the rights of the Creditor-Defendants to those of the Debtor against a non-bankruptcy defendant, which is not contemplated by the Code.

*Id.* The Court denied Phar-Mor's Motion for Preliminary Injunction.

In *Capital Salvage v. Gordon Noble (In re R.E. Loans, L.L.C.)*, 519 B.R. 499 (Bankr.N.D.Tex. 2014), both the debtor, R.E. Loans, L.L.C. ("R.E."), and its creditors filed suit

against Wells Fargo Capital Finance, L.L.C. ("Wells Fargo").  The creditors alleged Wells Fargo

participated in a fraudulent scheme to offer them membership for notes.  R.E. sought to enjoin the

creditors from pursuing their action against Wells Fargo.  The Court found that the creditors' claims

were direct, rather than derivative, because they outlined allegations of inducements made directly

to the creditors by the defendants and which gave rise to the claimed damage.  *Id*. at 508 (citing *In*

*re Seven Seas Petroleum, Inc*., 522 F.3d 575, 586 (5th Cir. 2008)).   The Court again cited the Fifth

Circuit's ruling in *Seven Seas* for the proposition:

> [T]he fact that the bankruptcy estate may have claims for its own direct injuries that
> it could have brought as of the commencement of the case does not mean that the
> creditor's claims are merely derivative of the debtor's.

*Id*. at 513.  The Court also found that the damages requested would not compensate the creditors for

the injury to R.E, but in abundance of caution, the Court stated:

> [T]o the extent a component of the [creditors'] damages at trial includes
> compensation to [R.E.] for ... mismanagement of [R.E.], that component of damages
> must be excluded...

*Id*. at 514.  The Court concluded:

> [I]t is impossible to enjoin the [creditors] from pursuing their direct claim against
> Wells Fargo for aiding and abetting the [R.E.] managers' breach of fiduciary duty
> owed to them as members.

*Id*. at 515.

   In *Begier v. Price Waterhouse*, 81 B.R. 303 (E.D.Penn. 1987), the trustee filed suit against

Price Waterhouse, the debtor's auditor ("Auditor"), asserting creditors' claims through 11 U.S.C.

§ 544.[3]   The Auditor filed a Motion for Summary Judgment on the basis that the trustee lacked standing to pursue the creditors' causes of action.

The Court found that the claims were specific, "personal to each creditor and require[d] proof that each creditor received the financial information prepared by [the Auditor] and relied on this information to its detriment."  *Id*. at 306.   Therefore, the trustee lacked standing to assert the claims under §544.

Trustee cites *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), as support for its contrary position.   In *Fisher*, Collins fraudulently solicited investments through his company Lake States Commodities, Inc. ("Lake States").   Involuntary bankruptcy petitions were filed against Lake States and Collins, and a trustee was appointed.   A group of creditors filed suit against accomplices of Collins and Lake States.   The trustee filed a Motion to Enforce the Automatic Stay, or in the Alternative, to Obtain Injunctive Relief.   The Court found:

> To the extent [the creditors] are suing the [accomplices] for debts that arose out of these] transactions, they stand in exactly the same position as the rest of the aggrieved investors, pursuing identical resources for redress of identical, if individual, harms.   As creditors, with claims so closely related to the Lake States estate, the [creditors] must wait their turn behind the trustee, who has the responsibility to recover assets for the estate on behalf of the creditors as a whole.

*Id*. at 881.

---

[3] Section 544 gives the trustee the power to assert general causes of action on behalf of creditors.

The *Fisher* Court cited a jurisdictional statute, 28 U.S.C. § 1334(b),[4] for its conclusion:

> In limited circumstance, the trustee may temporarily block adjudication of claims that are not property of the estate by petitioning the bankruptcy court to enjoin the other litigation, if its sufficiently "related to" her own work on behalf of the estate.

*Id.* at 882. The Seventh Circuit used section 105 to enjoin the creditors suit pending the outcome of the bankruptcy proceeding as impairing jurisdiction. *Id.*

On the surface, *Fisher* is authority for the relief Trustee seeks. The *Fisher* Court enjoined claims held by creditors against non-debtor third parties because they might reduce the *Fisher* estate's recovery. On closer inspection of the facts, however, it becomes apparent that *Fisher* does not go that far. Although the *Fisher* Court states that the creditors held direct claims against the other defendants, the claims were for generalized damages suffered as a result of the defendants' conduct with Fisher. The record is absent of any conduct directed specifically and uniquely by the defendants to the creditors. While the creditors articulated claims against the defendants, the basis for those claims existed due to the actions perpetrated on Fisher. For this reason, the creditors claims were claims any Fisher creditor could assert and, therefore, derivative of Fisher.

Trustee also cited *Peterson v. Ellerbrock Family Trust, L.L.C. (In re Lancelot Investors Fund, L.P.)*, 408 B.R. 167 (Bankr.N.D.Ill. 2009), which relied on *Fisher*. In *Lancelot*, the creditor admits that he only has general, rather than specific, claims. Again, this case does not support

---

[4] 28 U.S.C. § 1334(b) provides:

> Except as provided in subsection (e)(2), notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Trustee's request to enjoin direct claims held against a defendant simply because they may compete with the estate for recompense.

Two Fifth Circuit decisions are controlling in this case, *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc.* and *Matter of Educators Group Health Trust*, cited *supra* at 13.   In *S.I. Acquistion, Inc.* ("SI"), SI defaulted on payments to Eastway.   Eastway filed suit in state court against S.I., its affiliate ("Abel"), and S.I.'s registered agent. When S.I. filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code, Eastway stayed its action against S.I. Nevertheless, it continued to pursue Abel and the registered agent.   S.I. filed a Motion for Sanctions for violation of the automatic stay seeking protection for both Abel and its registered agent.   The Fifth Circuit summarized "three guiding principles" from its decision in *In re Mortgage America*:

> (1) a section 362(a)(3) stay applies to a cause of action that under state (or federal) law belongs to the debtor;
>
> (2) a section 362(a)(3) stay applies to a cause of action that seeks to recover property of the estate where the property is held or controlled by a person or entity other than the debtor; and
>
> (3) in applying the above rules we do so by keeping in mind the Bankruptcy Code's general policies of securing and preserving the debtor's property and of ensuring equal distribution of the debtor's assets to similarly-situated creditors.

*S.I.*, 817 F.2d at 1150.  The Fifth Circuit ruled that because the state court suit was "premised solely upon the theory that the defendants therein are controlling entities or persons of a chapter 11 debtor," the automatic stay applied.  *Id.* at 1151.  Eastway's alter ego cause of action belonged to the debtor because the claim could have been brought by any creditor of S.I.

In *Matter of Educators Group Health Trust*, the Educators Group Health Trust ("EGHT") provided benefits to teachers in small school districts.  EGHT filed a Voluntary Petition for Relief

20

under Chapter 7 of the Bankruptcy Code, and the school districts became creditors of the estate. Seven (7) of the school districts filed suit in state court against the administrator of EGHT charging that direct solicitations by the administrator to them were fraudulent.  The chapter 7 trustee sought to enjoin the districts from pursuing their state court suit.

There is no question that the losses sustained by the districts were a part of the losses sustained by the county.  Nevertheless, the Court found that some causes of action were property of the estate while others were not.

The Court concluded that any actions based on negligent management of EHGT, breach of contract, or breach of fiduciary duty in connection with the administration of the county's fund were generalized claims derivative of the injury to EGHT.  Because these wrongs were perpetrated on EGHT, they were not specific to the district participants in the EGHT fund and the harm experienced by any individual district was derivative of the harm inflicted on EGHT.

On the other hand, claims for fraudulent and negligent misrepresentations directly to the districts by the defendants were based on specific conduct against them.  As such, those claims were not property of the estate.  Although the damages alleged by the individual districts were included in the damages sustained by EGHT,  the claims were not derivative, and the Fifth Circuit held this fact did not justify enjoining their pursuit.[5]

---

[5]  The Court found, even though the same transaction was at issue and the same resources were being pursued, if the claim alleged a direct injury to the creditor, it belonged to the creditor. *Id*. at 1286.

### 3. The Pride Complaint

Based on the case law cited above, the Court concludes that some of the claims asserted by Pride are derivative of FSW and, thus, property of the estate. Beginning with Pride's claims under La.R.S. 37:91(B)(2), Pride must detail facts to establish its reliance on the FSW Audits and LaPorte's knowledge that the FSW Audits would be used as support for Pride's actions.

Pride has failed to articulate facts supporting LaPorte's knowledge that the FSW Audits would be relied upon by Pride in advancing funds or resources for FSW's operating costs. This applies to losses sustained as a result of Payroll, Operation, Licensing or Market Costs, and Loans.

Pride has also failed to articulate a direct claim against LaPorte in connection with its Rebate Costs or Vendor Guarantees. Pride alleges that the guarantees and rebate advances exceeded the authority of its officers or were *ultra vires*. That allegation by its very nature refutes that the advances were knowingly made by Pride and dependent on the FSW Audits. Nevertheless, should Pride assert this claim in the alternative, (*i.e.* that the officers were induced to participate in both of these programs based on the FSW Audits) Pride has not asserted a sufficient nexus between the FSW Audits, LaPorte's knowledge that Pride would rely on the Audits for these advances, and Pride's actions.

In short with regard to these damages, the Pride Complaint fails to state how the FSW Audits created a unique loss to Pride, differing from the losses sustained by any other creditor. All creditors advanced funds, credit, or resources to FSW prior to collapse. In order to distinguish Pride's actions from those of other creditors, Pride must detail facts that outline both Pride's reliance on the FSW Audits to make these advances and LaPorte's knowledge that its audits were being used for this purpose. It has failed to do so.

The only claim alleged by Pride under La.R.S. 37:91(B)(2) that contains allegations of specialized injury concerns Pride's decision to increase its guarantee of FSW's loan to Iberia.  Pride has stated a unique claim based on its reliance of the FSW Audits.  Those Audits were conducted by FSW in an effort to secure additional financing for expanded operations.  Pride's guarantee was critical to additional funding by Iberia.  As a result, the Court finds that this claim is both specific and direct as to Pride ("FSW Audit Direct Claim").

Additionally, Pride's claims  under La.R.S. 37:91(1) brought in connection with the Pride Audits are Pride's property.  Because the estate is not in privity with LaPorte on the Pride Audits, nor has it asserted or could assert any claims based on those audits, the causes of action are separate and distinct. The Court finds that allegations pertaining to Saturn, Rebate Costs or Vendor Guarantees all constitute direct claims held by Pride.  These claims rely not on the FSW Audits, but the failure of LaPorte to discover and report unauthorized conduct within the management of Pride while it was conducting the Pride Audits ("Pride Audit Direct Claims").

By the same token, the Court cannot find any articulated reason LaPorte's conduct in connection with the Pride Audits would create any liability for the expenses or resources advanced by Pride to FSW for Loans, FSW's Payroll, Licensing, Marketing or Operating Costs.  Therefore, it finds that these claims have not been sufficiently tied to LaPorte's conduct in connection with the Pride Audits.  Instead, they appear to be an attempt to shoehorn additional losses into a claim against LaPorte under 37:91(B)(1).

### C.  The Relief Requested

Trustee has requested injunctive relief under two separate sections of the Bankruptcy Code, 11 U.S.C. §§ 105(a) and 362(a)(3).

23

### 1.  Standard for Injunctive Relief Under 11 U.S.C. §362(a)

Trustee contends that the causes of action raised by the Pride Complaint are property of the estate and the Pride Complaint violates the automatic stay granted by 11 U.S.C. § 362(a)(3).

 If a cause of action is property of the estate, the trustee controls its disposition.

> A trustee's exclusive ability to bring causes of action that generally affect all creditors fosters the goals of the automatic stay by promoting orderly resolution of claims and preventing single creditors from achieving preferential recoveries.

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities, L.L.C.*, 443 B.R. 295, 312 (Bankr.S.D.N.Y. 2011) ("*Madoff* 2011").

For this reason, the automatic stay prohibits a third party creditor from pursuing causes of action which belong to the estate.[6]  Specifically, section 362(a)(3) provides a bankruptcy petition acts to stay of "any act to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate."  No other proof of its applicability need be shown.[7] The parties do not contest this is the law under section 362(a)(3).

### 2.  Standard for Issuance of Injunctive Relief under Section 105(a)

Even if a cause of action is not property of the estate, an injunction under 11 U.S.C. § 105(a) is requested.  Trustee seeks an injunction preventing Pride from prosecuting any causes of action.

---

[6]  A debtor may only pursue property of the estate while in the position of a debtor-in-possession and even then, only for the benefit of the estate.  *See Kane v. National Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) ("[A] trustee, as the representative of the bankruptcy estate, is the real party in interest, and is the only party with standing to prosecute causes of action belonging to the estate once the bankruptcy petition has been filed.").  *See also* 11 U.S.C. § 1107(a) (If no chapter 11 trustee has been appointed, the debtor-in-possession has the rights, powers, and duties of a trustee.).

[7] "When a bankruptcy petition is filed, an automatic stay operates as a self-executing injunction." *Campbell v. Countrywide Home Loans, Inc.* 545 F.3d 354-55 (5th Cir. 2008).

24

Trustee argues that Pride's pursuit against LaPorte might impair his ability to obtain or collect on potential settlement of or judgment on the estate's claims. Trustee asserts the Court need not perform the analysis for traditional injunctive relief under F.R.B.P. 7065 when enjoining a party under section 105.[8]

In *Feld v. Zale Corp. (Matter of Zale Corp.*), 62 F.3d 746, 761 (5th Cir. 1995), injunction was sought based on a settlement agreement. The Fifth Circuit held that an adversary proceeding was the proper vehicle in which to seek injunctive relief. *Zale*, 62 F.3d at 764. The *Zale* Court also found that the lower court failed to perform the traditional analysis for injunctive relief under F.R.B.P. 7065. *Id*. at 765.

> Moreover, we find no indication on the record that the bankruptcy court conducted the proper analysis and made the requisite findings for entry of a preliminary injunction. *See Commonwealth Oil Ref. Co. v. U.S.E.P.A. (In re Commonwealth Oil Ref. Co.)*, 805 F.2d 1175, 1188-89 (5th Cir. 1986) ("[T]he legislative history of § 105 makes clear that stays under that section are granted only under the usual rules for the issuance of an injunction."), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); *In re Eagle-Picher Indus., Inc.*, 963 F.2d [855,] 858 [(6th Cir. 1992)] ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions issued pursuant to Federal Rules of Civil Procedure 65.").

*Id.* at 765.

Imposition of injunctive relief under section 105(a) requires application of the traditional tests for injunctive relief.

> (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing

---

[8] P-23, p. 32.

the injunction; and (4) that granting the injunction will not disserve the public interest.

*Id.* (citation omitted).

In summary, if 11 U.S.C. § 362(a)(3) is utilized to enjoin an action against property of the estate, the traditional tests for injunctive relief are not applied.  However, if 11 U.S.C. § 105(a) is the basis for injunctive relief, the traditional test for issuance must be met.

### 3.  Application of Section 362(a)(3)

For the reasons set forth above, all claims derivative of FSW are property of the estate and Pride is enjoined from their pursuit.  For the sake of clarity, they include all claims for damages resulting from Pride's allegation of reliance on the FSW Audits in connection with injuries sustained for Rebate Costs and Vendor Guarantees.  It also includes Pride's claims for injuries associated with FSW Loans, Payroll, Licensing Marketing or Operating Costs.

### 4.  Application of Section 105(a)

Although the Pride Audit Direct Claims and FSW Audit Direct Claim are not property of the estate, Trustee requests the Court enjoin Pride from asserting those claims under 11 U.S.C. § 105(a).

Section 105(a) of the Bankruptcy Code permits courts to "issue any order, process, or judgment, that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. In the past, courts have used section 105 to provisionally enjoin third-party actions against non-debtor entities when the prosecution of the claim might interfere with the administration of the reorganizational effort.

In *Feld v. Zale Corp.*, cited *supra* at 24, the Fifth Circuit addressed injunction of third-party actions under section 105.  In *Zale*, the creditor sued Zale's directors and its directors and officers ("D & O") liability insurer for general damages due to the board's alleged malfeasance.  The debtor

26

held identical claims. Because the proceeds of the D & O insurance policy or the individual assets of the board members would flow to the estate and benefit all creditors, the Court enjoined the suit to prohibit one creditor, with generalized damages, from receiving more than others in the same position. This concept has more recently been articulated as the direct versus derivative analysis. However, *Zale* does not stand for the proposition that direct claims for distinct conduct applicable to only the creditor at issue may be enjoined simply because they compete with the estate for third party resources.

The Fifth Circuit held that in order for a court to exercise power under section 105 subject matter jurisdiction must exist over the matter to be enjoined. *Id.* at 751 (citations omitted). The Court noted that shared facts do not in and of themselves make the third party action related to the bankruptcy case. Nor does judicial economy justify related to jurisdiction. *Id.* at 753-754.

> [W]e must establish independently that a dispute is part of a bankruptcy case; the existence of power within the bankruptcy case does not imply an expansion of jurisdiction beyond it. To the contrary, it suggests that courts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes in which sone[one] ...may be bankrupt. *Id*. at 755.

In *Zale*, a settlement between Zale's D&O carrier, certain of its directors and the estate included a provision enjoining any third party from pursuing claims against the insurer. The policy limits were being exhausted through the settlement. National Union Fire Insurance Company ("NUFIC") and Feld (a non-settling director) objected to the settlement because it enjoined them from pursuing the insurer. Both parties alleged claims of bad faith against the insurer, Feld also held claims in contract.[9] The Fifth Circuit agreed that the bad faith claims were not subject to injunction

---

[9] NUFIC was the excess carrier. It asserted claims of bad faith against CIGNA, the primary carrier based on CIGNA's agreement to settle for the policy limits. Because the

because they did not involve property of the estate nor were they claims that could have been brought against the debtor.

As to the claims under contract, the Court found that permanent injunctive relief was improper.  However, temporary injunctive might be possible provided the proceeding to be enjoined was "related to" the bankruptcy case under 28 U.S.C. § 1334.  In such a case, a temporary injunction of third-party actions "may be proper under *unusual* circumstances." *Id.* at 761 (*Emphasis supplied*, citations omitted).

> These circumstances include 1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." ... If not, a bankruptcy court may not enjoin the third-party action.

*Id.*

This is a liquidation, not reorganization, case.  The administration of the case will not be affected by Pride's pursuit against LaPorte.  Further, the Pride Audit Direct Claims are unrelated to the bankruptcy case or the claims held by Pride against FSW.  Pride holds claims associated with advice given by LaPorte concerning consolidated financial statements.  It also seeks damages related to amounts advanced to Saturn, a subsidiary of FSW, but not FSW.  Finally, Prides asserts that through a breach of LaPorte's duties to it under the Pride Audits, the *ulta vires* conduct of its officers or directors was not discovered.  It also holds claims based on LaPorte's conduct in connection with the guarantee increase.  Conduct specific to Pride and not FSW.

---

settlement exhausted the primary policy limits, Feld held claims based on CIGNA's bad faith in settling for the primary policy limits as well as breach of contract for leaving him with less coverage.

In *Zale*, the Fifth Circuit found that the distribution of the D&O policy proceeds were sufficiently related to the Zale estate so was to create related to jurisdiction over the policy and those that might seek recompense from its limits.  This case is different.  The policy in question belongs to a third party, LaPorte, was paid for by LaPorte, and is designed to compensate those with claims against LaPorte.  In contrast, the Zale D&O policy belonged to Zale.  Its premiums were paid by Zale to insure it against claims against the company for actions of Zale's officers and directors.  The claims against LaPorte are based on LaPorte's conduct, not that of the debtor.  The assets available to satisfy them are those belonging to LaPorte and do not involve the estate.  As a result, the claims held by Pride against LaPorte will not be decided by the claims resolution process in FSW's case.  Bankruptcy jurisdiction does not extend to the Pride Direct Claims as they are neither claims against the debtor nor its property.

Trustee argues  Pride's pursuit against LaPorte might jeopardize the estate's claims should Pride and Trustee take conflicting positions.  He also argues that LaPorte has insufficient insurance and resources to satisfy both Pride's and the estate's claims.  Trustee's position argues that irreparable harm may occur to the estate if Pride is allowed to compete with the estate for limited resources.  He also contends that most of Pride's alleged damages accruing as a result of the Pride Direct Claims stem from monies advanced to FSW; therefore, they are included in the universe of claims that will be paid should Trustee succeed against LaPorte.[10]  Trustee argues that as a result,

---

[10]  Even though Pride is a creditor of FSW, its claims against LaPorte will not be resolved in the process of ruling on its proof of claim.  They are therefore unrelated to this bankruptcy proceeding.  (*i.e.* Claims against Saturn; for breach of the agreement between Pride and LaPorte; damages based on advice concerning consolidated financial statements; and failure to discover the unauthorized conduct of Pride's officers).

the potential injury to the estate is outweighed by any injury Pride may suffer should its Direct Claims be enjoined.

Trustee asks this Court to exceed the bounds of law.   As previously explained, a large portion of Pride's Direct Claims have no relationship to FSW, specifically those related to accounting advice or Saturn.   Further, the claims for LaPorte's failure to discover the mismanagement of Pride's officers or directors is also unrelated to FSW's case.  Pride and the estate each hold claims against the same third parties and their insurers, and they will by necessity compete for payment from these defendants.  However, because  neither the patrimony of the third parties nor their insurers are property of the estate and bankruptcy jurisdiction does not extend to these claims, enjoining their progress takes an extraordinary showing of damage to the estate.  The power to enjoin third party actions is generally utilized to protect officers or key employees from outside litigation while their attention and effort are needed to reorganize a debtor.  This case is factually in opposite to those decisions.

The right of a party to pursue its own cause of action cannot be abridged by a bankruptcy court with no interest or jurisdiction over the claim simply because it may compete with the Trustee for recovery.

Trustee also asserts that Pride should be enjoined because in his opinion, Pride cannot succeed on the merits. Trustee invites an examination of Pride's evidence prior to allowing Pride any opportunity to conduct discovery.[11]  This amounts to prejudging the viability or probability of Pride's success on the merits. Trustee has offered no authority for the assertion that this Court should weigh the merits of Pride's claims as a factor supporting the denial or grant of injunctive

---

[11]  To date, Pride has agreed to forbear from any discovery in connection with the Pride Complaint while the action by Trustee for injunctive relief is pending.

relief.  The Court declines the invitation to exert control over property belonging to a creditor against an unrelated  non-debtor in this factual circumstance.

## IV.  Conclusion

For the reasons assigned above, the following claims by Pride against LaPorte and related to the FSW Audits are property of the estate, and the automatic stay pursuant to section 362 prohibits Pride from pursuit:

1. Pride's claims for damages resulting from advances $1,204,054.79 to FSW customers for manufacturer rebates earned by FSW but unpaid, Rebate Costs;

2 $3,762,677.53 in loans to FSW, Loans;

3. $50,811.50 in payroll advances to FSW, Payroll Costs;

4. $84,995.79 in advances of cash or resources to FSW for operation of its licensing program, Licensing Costs;

5. $1,258.42 in advances of cash or resources to FSW for operation of its market source operating division, Marketing Costs;

6. $398, 276.53 in advances to FSW for general operating expenses, Operating Costs; and

7. $7,003,733.78 in payments to vendors of FSW on invoices guaranteed by Pride, Vendor Guarantees.

The following claim against LaPorte, although related to the FSW Audits, is not property of the estate and Pride may pursue it: $5,715,061.20 in additional guarantees to Iberia.

Additionally, claims brought by Pride under La. R.S. 37:91(B)(1) for damages sustained as a result of LaPorte's conduct in connection with the Pride Audits may be pursued because they are not property of the estate.   These claims include LaPorte's failure to discover and report the alleged unauthorized conduct of Pride's officers in granting guarantees to FSW vendors or funding

manufacturer rebates earned by FSW but not yet paid. In addition, LaPorte's failure to report advances to Saturn are directly held by Pride.

Pride may not pursue any claim for its more generalized damages sustained as a result of Loans to FSW, advances of resources or cash to FSW in connection with Payroll, Licensing, or Marketing or Operating Costs. Pride has failed to articulate a claim under LaR.S.37:91 that is sufficiently grounded in the Pride Audits or in LaPorte's knowledge of Pride's reliance on the FSW.

The Court will enter a separate Judgment in accord with this Opinion.

New Orleans, Louisiana, August 30, 2018.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge